**Paul M. MAY, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–499.**

Court of Criminal Appeals of Oklahoma

Feb. 19, 1975.

Rhoads & Johnson, Inc. by Githen K. Rhoads, Lawton, Paul M. May, pro se, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., James D. Bednar, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Paul M. May, hereinafter referred to as defendant, was charged, tried before a jury, and convicted in the District Court, Comanche County, Case No. CRF–73–411, for the crime of Murder in the Second Degree in violation of 21 O.S.1971 (Supp.1973) § 701.2. His punishment was assessed at ten (10) years to life imprisonment in the custody of the State Department of Corrections, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial the first witness was Officer Rose, Deputy Sheriff of Comanche County. Rose testified that on the 24th day of June, 1973, at 1:30 p. m., he arrived at a residence located seven miles west of Lawton, Oklahoma. Rose approached the south door, which was ajar, and saw the body of the victim. Upon investigation of the inside of the house he found a broken hoe handle and a large piece of driftwood. The driftwood was stained with what Rose believed to be blood and long gray hairs were attached to it matching the hair of the victim. The other rooms in the house were in disarray and several boxes of Avon products were scattered here and there. Another deputy then testified to

substantially the same facts as did Officer Rose, and the prosecution put the driftwood into evidence. Lewis Fry, a friend of the victim, then testified that he entered the residence along with Officer Rose and identified the deceased.

The State then called the operator of the mobile crime unit of the Lawton Police Department, Ron Rutledge. On the 24th day of June, 1973, Rutledge took the mobile unit to the residence in question where he took photographs both inside and outside the house, and of the deceased.

Dr. Fred Jordan, a physician in forensic pathology employed by the State of Oklahoma as an assistant medical examiner, testified concerning his examination of the victim's body. It was his opinion that the deceased died of severe head wounds inflicted with a great amount of force. The doctor then delineated the specific head injuries and stated that they could be caused by any number of blunt objects.

Marvin Glenn Earnest then testified, over the objection of defense counsel. The defense objected on the grounds that Earnest was charged prior to the defendant with the same offense, but had not gone to trial before the defendant which was not in accordance with the rules of the court and evidenced that Earnest's testimony was coerced and induced by promises made to Earnest to secure his testimony. The objection was overruled by the trial judge. Earnest then stated that he was a resident of Lawton, Oklahoma, in June of 1973, and that he knew the defendant. He further stated that on June 23, 1973, he was in the defendant's company while they, along with a third party, Don Ficklin, were riding around cashing checks to get enough money to get the defendant's van out of hock. They were riding in a Comet station wagon which belonged to a Teresa Powell, Earnest's girl friend. They were successful in getting defendant's van out of hock and regrouped later in the day at a bar in Lawton. From there they continued riding around cashing checks, stopping finally at the Stardust Cowboy Inn for a few beers. They then left to find some place to burglarize and proceeded approximately six miles out Cache Road to a flattop house; arriving there sometime around 6:30 p. m. The defendant exited the car and knocked on the door to determine if the house was occupied. There was no answer. Earnest then left the car and joined the defendant at the house. The defendant kicked in the door, both went inside, and they began sacking the valuables. While Earnest was in the bedroom, the defendant came in and told him that someone had come home. The defendant ran from the bedroom and Earnest then heard disturbances from the living room area. Earnest then ran to the room and saw the defendant beating an old lady, using a hoe handle. Earnest took the hoe away from the defendant and slapped him a few times. By that time Don Ficklin was waiting out front in the station wagon to pick up the goods. Earnest and the defendant decided they had sacked enough and Earnest began loading it while the defendant knocked out the old lady. When Earnest loaded the final box, he returned to the house and saw the defendant senselessly beating the victim with what looked like a log. Earnest again got into a fight with the defendant, taking the log away from him. The station wagon was loaded with pillow cases, gunny sacks and boxes. The boxes contained new Avon products. The victim's purse, taken to the car, was searched for valuables while the three rode around trying to decide how to dispose of the purse. First they placed the contraband into a barn which had been previously used by them for auctions. Then they filled the purse with rocks, wired it shut and dumped it into a lake. Returning to Lawton together, Earnest made a phone call to his brother in California to determine if the fruits of the burglary could be sold there. The defendant then took his van and proceeded to Earnest's house. There the defendant washed blood from his hands and complained that he thought he had broken some bones in his hands. Earnest stated that he noticed the defendant's hand was hurt when they got into the car at the victim's house. There was also

blood on the defendant's shirt. The three then tried to figure out an alibi and decided to go to the drive-in movie, which they did.

The next morning, the defendant and Earnest went to Medicine Park, where the stolen goods had been placed in the barn, and there they boxed them. Earnest then left and returned to his home in Lawton. He later left for Arkansas.

On cross-examination, Earnest admitted making prior statements to the Lawton police concerning the incident in question. In his prior statements he had given different times at which the three men had met at Sandy's Bar on the date of the murder. He was arrested in Arkansas on July 13, 1973, and made statements there under the impression that he would be given complete immunity in exchange for his testimony. He also waived extradition to secure the release of his sister, Jerry Ashcraft, and girlfriend Powell. Earnest stated that the District Attorney's Office offered him all the "slack" possible for his testimony. Earnest's murder charge was to be dropped and he was to plead guilty to a burglary offense. A statement from the preliminary hearing stating such was read by defense counsel. Cross-examination continued to deal with Earnest's prior inconsistent statements concerning the time of events and the vehicle used on the date in question. Earnest testified that he purposefully lied on the earlier occasions out of fear that the District Attorney's Office would doublecross him concerning the exchange of testimony for leniency. He stated that his prior statements were not worth "fifty cents." Discrepancies between Earnest's earlier statements about the presence of the defendant in Earnest's house after the murder; the defendant washing his hands of blood; the presence of blood on Earnest's shirt; and the amount of blood on the defendant's clothes, were brought out by defense counsel.

Teresa Powell, Earnest's girlfriend, testified that on the date in question, Earnest and the defendant came by her place of employment between 5:30 and 6:00 p. m. She was to get off work at that time but a fellow employee was ill and she stayed at work. The witness again saw the defendant, Earnest and Don Ficklin later that evening between 8:30 and 9:00 p. m. They came into the house where she was living with Earnest, about the same time. The defendant had blood on his hand and also appeared to have a few broken fingers. The defendant also had blood on his shirt. The defendant washed, talked about everyone going to the drive-in movie and left. The witness left for Arkansas the following evening with Earnest.

She further stated that she had been in an Arkansas mental institution for a period of two weeks due to nervous problems. It was her further testimony that she was present when Earnest had an altercation with another person and a shot was fired, narrowly missing her; and that she and Earnest had been involved in altercations and disagreements in the past.

The next witness was Robert Jones of the Woodland, California Police Department. Jones investigated a fire early in July of 1973, at the home of Earnest's brother in California. A white van bearing Oklahoma license plates was at the residence. The defendant was the registered owner. The defendant was also seen at the residence by the officer. Jones also picked up a cardboard box from the premises which was then introduced into evidence, and contained new Avon products and newspaper packing from Lawton, Oklahoma, dated April 18, 1973.

E. L. Turner, Deputy Sheriff of Comanche County, testified that he, along with others, accompanied Earnest to the dam on Lake Jed Johnson to retrieve the purse, which was then introduced into evidence.

The State then rested its case and the defense demurred to the evidence due to the alleged failure of the State to corroborate the accomplice's testimony. The Demurrer was overruled.

Jerry Ashcraft then testified for the defense that she is the defendant's step-

daughter. On the 23rd day of June, 1973, the defendant and Earnest took her to Medicine Park at approximately 10:30 a. m. to a barn where she worked with merchandise for an auction. She was taken in the 1966 Comet station wagon. At 6:00 or 6:30 p. m. she was picked up by her mother, Mrs. May, in a white van, and taken home to Lawton. The defendant was at home at that time and remained there until they all went to the show later in the evening. The defendant left the house the next morning and returned home in the afternoon. The witness testified that she was an Avon representative and was indebted to them for merchandise.

The next witness was Helen May, the wife of the defendant and mother of Earnest. On the date in question, Earnest came by the May house and picked up the defendant and his step-daughter to go to Medicine Park. The defendant returned to the house at approximately 3:00 p. m. She stated that they went to the drive-in movie about 8:00 p. m. Her testimony was substantially the same as that of her daughter, Jerry Ashcraft.

On cross-examination, counsel brought out that the length of daylight on a summer day would make it impossible to start a drive-in movie at the early time urged by the witness.

The defendant, Paul May, then took the stand in his own behalf. He testified that on the morning of the day in question he was taken, with his step-daughter, by Earnest, in a Comet station wagon to Medicine Park where they left her to work on merchandise for an auction sale. Earnest and the defendant then returned to Lawton, going to several places and then to the location of the defendant's van to get it out of hock. The defendant returned to his store at approximately 3:30 p. m. Later, his wife went to pick up her daughter from Medicine Park. The defendant remained at the store. His wife and step-daughter returned about 6:00 p. m. At 7:15 or 7:30 p. m. the family went to the house where Earnest and Teresa lived to pick them up to go to the movie. They returned home after the movie.

The following morning the defendant went to Medicine Park. Earnest arrived there later, in the Comet. Earnest asked if the defendant wanted to purchase some burgularized goods and the defendant refused. The defendant returned to the Lawton store later in the afternoon and again met with Earnest who, after changing tires on the Comet, left. The defendant later went to Earnest's home and observed him preparing to leave for Arkansas.

The defendant denied any involvement in the murder. He stated that he knew nothing of the offense. He testified that he then left Lawton with his wife for California, where he held intermittent employment under a different name.

Both counsel then stipulated to the suicide of Donald Ray Ficklin in the Lawton jail, after his arrest.

The defense has filed two briefs in the appeal to this Court; one pro se and the other by counsel. The first common error alleged in both briefs is that the conviction of the defendant was obtained by the knowing use of perjured testimony of the accomplice, Earnest. The briefs complain that the accomplice lied about certain negotiations (which are explained below), and as a result this information, essential for the proper weighing of the credibility of the main witness by the jury, was lacking. Reviewing the record, we find that it shows that the District Attorney's Office either by itself, or through the attorney of the witness, had, in fact, negotiated with the witness concerning a reduction in the charge filed against him in return for his testimony against the defendant.

During the trial, the witness made the following statements concerning negotiations for testimony:

"The only inducement they have offered me was that they would give me all the slack that the District Attorney's office could possibly give me."

And later:

"Q. At some time prior to this you have received information from your attorney to the effect that if you would testify in court against Paul May that your charge of murder would be dismissed and a burglary charge would be filed, and you would be sentenced to one year. To which you answered, 'I was under the impression that the charge would be dropped.'

A. I was under that impression."

And later:

"Q. Were you ever at anytime promised immunity?

A. No, sir, not complete immunity."

 As stated in the defendant's brief, the burden is upon the defendant to prove that the witness' testimony was, in fact, perjured. The proposition of error urged by the defendant that the witness perjured himself by denying that his testimony was procured by negotiations with the prosecution cannot be seen to have merit in light of the witness' statements at trial, above quoted. In light of the record and testimony given by witness Earnest, we are of the opinion that this assignment of error is wholly without merit.

In passing, we also observe that this case is clearly distinguishable from Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. In *Giglio,* the Supreme Court was presented with a case in which one man was charged with an offense as a result of the testimony of an accomplice who was named as a co-conspirator by the grand jury, but not indicted. It was the testimony of this unindicted co-conspirator at trial that secured the conviction of the defendant. Defense counsel vigorously cross-examined the witness, seeking to discredit his testimony by revealing possible agreements or arrangements for prosecutorial leniency:

"[Counsel] Did anybody tell you at any time that if you implicated somebody else in this case that you yourself would not be prosecuted?

[Witness] Nobody told me I wouldn't be prosecuted.

Q. They told you you might not be prosecuted?

A. I believe I still could be prosecuted."

Counsel then brought out the fact that the witness had never been charged with anything in connection with the case. In summation, the government attorney stated that the witness had received no promises that he would not be indicted. In fact, new evidence was later discovered proving that the witness had been promised immunity by another government attorney in the early stages of the trial's preparation. This evidence was considered sufficient to prove the evidence presented at trial false and, therefore, the deception perpetrated upon the court and jury by the presentation of such evidence was deemed incompatible with "rudimentary demands of justice." Mooney v. Holohan, 192 U.S. 103 at 112, 55 S.Ct. 340 at 342, 79 L.Ed. 791 (1935).

In the case at bar the prosecutor did not deny that the witness had negotiated with the District Attorney's office through the witness' counsel. Furthermore, the witness himself did not deny that he bargained with the prosecutor. This was brought to the attention of both the court and jury by the objection of defense counsel at the outset of Earnest's testimony, as well as during the cross-examination of the witness.

We find, absent new evidence such as presented in Giglio v. United States, supra, from the record, that the testifying accomplice's dealings with the prosecutor's staff was brought out before the court and the jury and did not constitute a suppression of material evidence meriting a reversal or new trial.

 The second error alleged in both briefs is that the testimony of the accomplice was not corroborated as required by 22 O.S. § 742, which reads as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as

tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the cirmumstances thereof."

There is no doubt that Earnest was an accomplice to the crime, being charged conjointly in the offense for which the accused was tried. The testimony of Teresa Powell concerning the condition of the defendant's hand being both bloody and injured when the three men returned from the scene of the crime, corroborated the testimony of the accomplice sufficiently to satisfy the requirements of the statute, and the circumstantial evidence relating to the presence of his truck in California, together with the fact that articles were found on the premises there which were similar to those taken from the scene of the homicide, also tend to corroborate the testimony of the accomplice. We stated in Rider v. State, Okl.Cr., 494 P.2d 347 (1972) that an accomplice's testimony need not be corroborated in detail, but it must be corroborated by such other evidence of material parts of his testimony as will tend to connect defendant with the commission of the offense. The testimony given not only connects the defendant with the commission of the crime, but also corroborates a material element of the crime, that the defendant sustained his injuries while affecting the death of the victim. This is sufficient corroboration as required under the statute. See Turci v. State, Okl.Cr., 482 P.2d 611 (1971), wherein we stated, in the second paragraph of the Syllabus:

"It is not essential that evidence corroborating an accomplice shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty, and if the accomplice is corroborated as to some material fact by independent evidence tending to connect defendant with the crime, the jury may from that infer that he speaks the truth as to all, but such corroborating evidence must show more than the mere commission of the offense or circumstance thereof, in view of 22 O.S.1961, § 742."

Further, we have stated in Burgess v. State, Okl.Cr., 488 P.2d 607, that evidence corroborating an accomplice and connecting defendant with the commission of the offense may be circumstantial only.

Defense counsel lastly contends that the trial court erred in overruling defendant's Motion to Quash, Dismiss and Set Aside Information, Demurrer, Demurrer to the Evidence, Motion for Judgment of Acquittal, Motion for Mistrial, as well as each and every pretrial motion made by the defendant and overruled by the court; and further, that the verdict is contrary to both the law and the evidence. We note that the defendant does not cite authority, nor argue this proposition in his brief. This Court has repeatedly held that it is necessary for counsel not only to assert error, but also to support his contentions by argument and authority. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this Court will not search the books for the authorities to support the mere assertion that the trial court has erred. See Sandefur v. State, Okl.Cr., 461 P.2d 954.

For all of the above and foregoing reasons, the judgment and sentence appealed from is accordingly affirmed.

BRETT, P. J., concurs in results.

BLISS, J., concurs.